IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JAMES J. BINNS, P.C., | : | |
| JAMES J. BINNS, ESQ., | : | |
| | : | |
| Plaintiffs | : | CIVIL ACTION |
| v. | : | No. 05-1930 |
| | : | |
| FLASTER GREENBERG, P.C., et al., | : | |
| | : | |
| Defendants. | : | |

**Brody, J.**          <u>**MEMORANDUM AND ORDER**</u>          **March 22, 2007**

Plaintiffs James J. Binns and his law firm James J. Binns, P.C., ("Binns"), sued defendants J. Philip Kirchner and Peter R. Spirgel and their law firm Flaster Greenberg P.C., ("Flaster"), for business torts arising out of their legal representation of a one Michael Smeraski. Flaster has moved for summary judgment. Because Binns has failed to offer sufficient evidence to establish essential elements of his claims, the motion as to all claims is granted.[1]

**Facts**[2]

Binns is a Pennsylvania lawyer with extensive experience in complex, multi-district civil, commercial, and class action litigation. J. Philip Kirchner and Peter Spirgel are shareholders of Flaster Greenberg, P.C., a New Jersey law firm. For many years, Flaster represented a Michael Smeraski in various legal matters. Smeraski was employed by McKesson, a health care

---

[1] Before dismissal, however, I will order an accounting.

[2] In deciding a motion for summary judgment, the facts must be stated in the light most favorable to the non-moving party. Here, the facts will be stated most favorable to Binns. <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 150 (2000); <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 255 (1986).

1

management company. In the spring of 1999, Smeraski engaged Flaster to represent him in possible litigation arising out of his termination from McKesson. During this engagement, the Securities and Exchange Commission served a subpoena on Smeraski, portending possible criminal charges down the road. Spirgel suggested to Smeraski that he consult with Binns regarding a possible criminal investigation by the Department of Justice. Spirgel explained to Smeraski that Binns was "of counsel" to Flaster. Smeraski understood that Binns possessed expertise in white collar criminal defense and securities litigation.

Flaster invited Binns to join the team, and Binns worked extensively on all matters relating to Smeraski. Smeraski viewed Binns as a member of the Flaster team and was pleased with Binns' work. Smeraski, however, entrusted Spirgel and Kirchner to decide how to staff his defense team, and Binns never entered into a separate engagement agreement with Smeraski.

Smeraski's defense costs were covered by a corporate directors' and officers' liability policy. For at least part of the duration of Smeraski's defense, Binns submitted his time to Flaster, Flaster billed Smeraski for Binns' time at a rate of $400 per hour, and then Flaster submitted those bills to the insurance carrier. More often, Binns billed separately through his own law firm, addressed these bills to Smeraski, and then submitted his bills directly to the insurance carrier. There is no evidence that Smeraski ever received bills from Binns directly, nor that Smeraski paid for his services out of his personal funds, nor that Binns had a formal compensation agreement with Flaster.

Flaster referred to Binns as "of counsel" to the firm on its website, and the Martindale Hubbell attorney directory also identified Binns this way. Flaster purchased malpractice insurance for Binns and printed Flaster business cards for him. Binns, however, maintained his

own law firm practice and entered his appearance in Smeraski's cases as James J. Binns, P.C., not as a member of the Flaster firm.

In November 2003, counsel for the insurance carrier informed both Flaster and Binns that the remaining coverage for Smeraski's defense was $250,000. Flaster and Binns agreed this sum was inadequate to fund the defense. They informed the carrier that the dangerously low proposed cap was evidence of bad faith and threatened to sue if the carrier refused to raise the cap.

Later in November 2003, faced with depleting insurance coverage for Smeraski's legal expenses, Flaster terminated Binns. Shortly thereafter, Binns informed Smeraski that Flaster had terminated him. Apparently Smeraski knew nothing of the decision and was "unhappy" to hear the news. Flaster then explained to Smeraski that Binns' services were "no longer needed" because a criminal action against Smeraski was no longer likely, and that Binns' services were unnecessary going forward on the remaining civil matters. Smeraski accepted Flaster's reasoning. Later in the controversy, Kirchner informed Binns that his continuing involvement was "not affordable" given the limited funds available for Smeraski's defense.

Subsequently, Binns made overtures to Smeraski and requested he transfer his representation to Binns or demand that Binns remain fully involved through Flaster. In one such conversation, Binns advised Smeraski to tell Flaster that Flaster should involve Binns fully in his defense, or Smeraski would "go with [Binns]." Binns also offered to represent Smeraski for free if Smeraski's insurance coverage ran out, but Smeraski doubted the feasibility of free representation. Smeraski never contacted Binns for further representation.

After Binns had been terminated, in December, 2003, Flaster negotiated a $1.7 million settlement with the insurance carrier that was paying Smeraski's legal bills. Binns continued to

contact Smeraski directly, prompting Flaster to remind Binns that he was not authorized to represent Smeraski.

By December, 2004, Flaster had received payment from the insurance carrier for invoices including charges for Binns' services. Binns wrote to Kirchner that he was aware the money had gone to Flaster, and in that same letter, he warned Kirchner not to deduct ten percent from his gross receipts. Binns stated: "The fact that I have, on occasion, voluntarily contributed ten percent of my billings to your firm is not the result of any 'agreement' nor is it supported by any consideration." Flaster sent Binns a check for $73,620.00, stating that this amount represented the remaining money owed to Binns for the time he billed on Smeraski's defense, less ten percent for purported overhead expenses. Flaster's cover letter also stated that an acceptance of the payment by Binns would be in satisfaction of the firm's entire remaining obligation to Binns. Binns never cashed the check.

On March 28, 2005, Binns filed this lawsuit in the Court of Common Pleas of Philadelphia County, and on April 26, 2005, Flaster removed the action to this Court based on diversity jurisdiction.

### Legal Standard[3]

Summary judgment should be granted under Federal Rule of Civil Procedure 56(c) "if, after drawing all reasonable inferences from the underlying facts in the light most favorable to the non-moving party, the court concludes that there is no genuine issue of material fact to be resolved at trial and the moving party is entitled to judgment as a matter of law." Kornegay v. Cottingham, 120 F.3d 392, 395 (3d Cir. 1997). A factual dispute is "genuine" if the evidence

---

[3] This Court has jurisdiction under 28 U.S.C. § 1332.

4

would permit a reasonable jury to find for the non-moving party. Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248 (1986). In order to survive summary judgment, a plaintiff must make a showing "sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The court must draw all reasonable inferences in the non-moving party's favor. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### Discussion[4]

In Count I, Binns asserts that Flaster intentionally interfered with his existing contractual relationship with Smeraski. Pennsylvania courts, following the Restatement (Second) of Torts, § 766, define the tort of intentional interference with existing contractual relations as:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss to the other from the third person's failure to perform the contract.

Adler, Barish, Daniels, Levin and Creskoff v. Epstein, 482 Pa. 416, 431, 393 A.2d 1175, 1183 (1978). The threshold requirement is that a contract existed between the parties. If there was such a contract, then there must be an improper inducement of a third party not to perform. Therefore, the question is whether there was a contract between Binns and Smeraski, and if so, whether Flaster's conduct was improper.

No express contract, either written or oral, existed between Binns and Smeraski, and there is no evidence that Binns had a separate implied in fact contract with Smeraski. An implied in

---

[4] Because the parties briefed the claims under Pennsylvania law, and neither party has asserted a preference for New Jersey law over Pennsylvania law, I apply Pennsylvania law.

fact contract is one inferred from the conduct of the parties. Elias v. Elias, 428 Pa. 159, 161, 237 A.2d 215, 217 (1968). It arises from the parties' mutual agreement and intent to promise. In re: Penn Central Transp. Co., 831 F.3d 1221, 1228 (3d Cir. 1987). In Elias, the lower court had found that an implied in fact contract existed between two brothers who had participated in a family partnership. 428 Pa. at 161-162. One of the brothers, feeling underpaid, began supplementing his low wages from the partnership revenues. One day, he left in anger one day and vanished for eight years. Id. at 161. The other brother threatened to recover those covert self-payments, but he never pursued his claims. Id. The Pennsylvania Supreme Court reasoned that, by vanishing for eight years, the first brother had manifested an intent to relinquish his interest in the partnership, and the other, by failing to pursue his claims, had manifested an intent to waive his rights with respect to those claims. Id. The Court found the parties had agreed on their obligations, but they manifested their intention through their acts, not in words. Id. No such dramatic facts appear in this case.

      The record reveals that Binns met Smeraski through Flaster. Smeraski never received bills directly from Binns, and he never paid for Binns' services out of his personal funds. Binns submitted his bills to the insurance carrier directly, or on occasion, through Flaster. Smeraski viewed Flaster as his counsel and Binns a part of the Flaster team. Smeraski relied on Flaster to decide whom to involve in his defense. Flaster chose to invite Binns on the team when it perceived him as an asset and chose to terminate Binns when it perceived him as no longer necessary. Binns' relationship with Smeraski emanated from Binns' association with Flaster,

and Smeraski denies ever separately engaging Binns.[5]  There is no evidence that Binns and Smeraski manifested an intention to be bound in any manner apart from Smeraski's contract with Flaster.

Even if there were such a contract, Flaster's conduct was not improper.  "Proper" conduct, while imprecise, encompasses conduct society sanctions as part of the "rules of the game."  Adler Barish, 482 Pa. 416, 393 A.2d at 1184.  It is "socially accepted" conduct.  Id.  Pennsylvania courts consider the factors enumerated in the Restatement (Second) of Torts § 767: (a) the nature of the actor's conduct; (b) the actor's motive; (c) the interests of the one with which the actor's conduct interferes; (d) the interests sought to be advanced by the actor; (e) the proximity or remoteness of the actor's conduct to interference; and (f) the relationship between the parties.  Id. at 433.

A review of the facts in light of the factors enumerated in the Restatement reveals that Flaster's conduct could not be considered improper.  The most relevant factors in this case are (1) the nature of Flaster's conduct, (2) Flaster's motive in terminating Binns, and (3) the relationship between the parties.  Under the first relevant Restatement factor, the nature of the actor's conduct may be improper if the conduct involves violence, misrepresentations, or violations of professional ethics.  Restatement (Second) of Torts § 767, comment (c).  Flaster used no such methods in terminating Binns.  Basically, Flaster made an ordinary staffing judgment through Spirgel and Kirchner, the individuals responsible for managing Smeraski's defense.  Flaster explained to Smeraski that Binns was no longer needed because the threat of a criminal

---

[5] Binns' conclusory affidavit to the contrary is insufficient to overcome summary judgment.  Blair v. Scott Specialty Gases, 238 F.3d 595, 608 (3d Cir. 1985).

prosecution by the federal government had subsided,[6] and that Binns was not needed on the ongoing civil matters.  Although initially unhappy to learn of Binns' termination, Smeraski readily accepted Flaster's staffing decision without protest once Spirgel and Kichner explained their rationale.  Binns has offered no facts to infer that Flaster advised Smeraski inaccurately, made misrepresentations, or that Flaster violated any rules of professional ethics in terminating him.

Under the second relevant Restatement factor, an actor may have an improper motive if he harbors ill will, the motive to injure another, or the bare desire to interfere with another's contractual relationship.  Id., comment (d).  Whether an actor has an improper motive may also depend on the actor's own interests.  Binns has not offered evidence to establish that Flaster acted with an improper motive.  There is no evidence that Flaster sought to injure Binns or harbored a bare desire to interfere with any contract between Binns and Smeraski.  Indeed, the record indicates that Flaster sought to contain costs and to preserve the insurance defense funds for itself.  There is no evidence that it was unreasonable for Flaster to preserve insurance defense funds by terminating Binns, a senior attorney charging $400 per hour, or that Flaster's desire to advance its own business interests was wrong.[7]

---

[6]This was an accurate prediction, as no criminal charges were filed.

[7]A lawyer's purpose in advising a client is not improper simply because the lawyer seeks additional fees or an enhanced reputation.  Los Angeles Airways, Inc. v. Davis, 687 F.2d 321, 328 (9th Cir. 1982) (attorney not liable for inducing client to breach contract simply because attorney acted with "mixed motives" and stood to benefit by advising client to commit breach); cf. Heffernan v. Hunter, 189 F.3d 405, 413 (3d Cir. 1999) (in action against attorney for federal civil rights conspiracy, "the mere fact that attorneys have 'mixed motives,' such as 'enhancing' their reputation by aggressive representation, does not remove their conduct from the scope of the agency.").

Under the third relevant Restatement factor, the relationship of the parties may justify one party inducing another party to breach a contract. For example, a business advisor may properly induce his client not to perform a disadvantageous contract, even if it would be improper to induce breach if the actor were not a business advisor. Id., comment (i). Here, it is significant that Spirgel and Kirchner were Smeraski's attorneys. Because Smeraski authorized them to decide how to staff his defense team, it was entirely proper for them to reassess Binns' value in light of all the circumstances, including limited insurance coverage, and to communicate their opinion to Smeraski. That was part of their job as legal professionals.[8] Considering the above factors, no reasonable jury could find that Flaster's conduct was improper. For the above reasons, Binns cannot prevail on Count I.

In Count II, Binns asserts a claim for tortious interference with a prospective contract. To prevail on this claim, a plaintiff must demonstrate the existence of a genuine issue of material fact with respect to each the following elements: "(1) a prospective contractual relation; (2) purpose or intent to harm the plaintiff by preventing the relation from occurring; (3) absence of privilege or justification on the part of the defendant; (4) occasioning of actual damage resulting from the defendant's conduct." U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia, 898 F.2d 914, 925 (3d Cir. 1990).

A "prospective contractual relationship" is "'something less than a contractual right,

---

[8]This factor incorporates Restatement (Second) of Torts § 772, which states that professionals are not liable for providing a third person with truthful information or honest advice within the scope of a request for advice, even if this advice "causes the third person not to perform a contract or not to enter into a prospective relation with another." Binns contends that Flaster gave Smeraski dishonest advice about Binns' value to the team, but he does not offer any evidence to establish Flaster's dishonesty.

something more than a mere hope.'" Santana Prods., Inc. v. Bobrick Washroom Equip., 401 F.3d 123, 140 (3d Cir. 2005) (quoting Thompson Coal Co. v. Pike Coal Co., 488 Pa. 198, 208, 412 A.2d 466, 471 (1979)). The Third Circuit interprets Pennsylvania law to require a plaintiff to demonstrate "an objectively reasonable probability that a contract will come into existence." Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173, 184 (3d Cir. 1997).[9] This "reasonable probability" may result from an unenforceable express agreement, an offer, or the parties' current dealings, but not merely from prior dealings or an existing business relationship between the parties. Allstate Transp. Co., Inc. v. Southeastern Penn. Transp. Auth., No. 97-1482, 1997 WL 666178, *11 (E.D. Pa. 1997) (Padova, J.). ("Under Pennsylvania law, merely pointing to an existing business relationship or past dealings does not reach this level of probability.")

As to the first element, Binns offers no evidence of any express agreements or offers, and Binns' "current dealings" with Smeraski were merely the byproduct of, and subsumed by, Smeraski's relationship to Flaster. Smeraski dealt with Binns as a member of his defense team, coordinated and staffed by Flaster. He entrusted Kirchner and Spirgel to decide whom to involve in his defense, and to what extent. Smeraski denies ever separately engaging Binns, nor does the record indicate that Smeraski gave Binns any indication that such an engagement was possible, let alone probable. From the record, no reasonable jury could find an objective basis for Binns to believe he would obtain a separate contract with Smeraski.

Even if Binns reasonably had more than a mere hope of a separate contract, he has not offered evidence to establish the third element of the claim, that Flaster's conduct lacked

---

[9]In Thompson, the parties entered into a year-to-year lease for mineral rights until a specified date. Because the parties had specified a date until which the lease would renew, the court found no reasonable probability that the lease would continue beyond that specified date.

privilege or justification.  "Privileged" conduct is "proper" conduct as defined by Restatement (Second) of Torts § 767.  Kachmar, 109 F.3d at 185.  As discussed previously, the record does not support a finding that Flaster's conduct was improper.  Therefore, Binns cannot prevail on Count II.

Binns also asserts a claim for conversion, Count III.  Conversion is the "deprivation of another's right of property in, or use or possession of, chattel, or otherwise interference therewith, without the owner's consent and without lawful justification." Universal Premium Acceptance Corp. v. New York Bank & Trust Co., 69 F.3d 695, 705 (3d Cir. 1995).  Conversion traditionally applied only to interference with chattel, but it has evolved to include interference with intangible rights identified with some document, such as a tax receipt or an insurance policy.  Keeton, Dobbs, et al.  Prosser and Keeton on Torts, pp. 91-92 (5th ed. 1984).  Money may be the subject of conversion under a narrow set circumstances, but failure to pay a debt is simply not conversion.  Bernhardt v. Needleman, 705 A.2d 875, 878 (Pa. Super. Ct. 1997) (citing Petroleum Marketing Corp. v. Metro. Petroleum Corp., 396 Pa. 48, 151 A.2d 616 (1959)).[10]

The record reveals that the insurance carrier paid Flaster's invoices for 2003, which included charges for Binns' time.  Flaster sent Binns a check for $73,620.00, a sum equal to Binns' fees for prior service less a ten percent deduction for overhead.  Challenging the

---

[10]In Bernhardt, attorney Needleman agreed to pay attorney Bernhardt a referral fee amounting to a percentage of a contingency fee award.  Id.  When Needleman's case settled, he refused to pay Bernhardt, and Bernhardt sued for conversion and breach of contract.  The court found the referral fee was property in which the attorneys had an interest, and that Bernhardt could maintain an action for conversion.  Id. at 879.  Needleman had promised Bernhardt a percentage of his final recovery, and this established Bernhardt's rights in a specified pool of funds.  By Binns' own admission, he had no agreement with Flaster creating rights to any particular set of funds.

legitimacy of the deduction, Binns has refused to deposit the check. Binns further asserts that Flaster placed "conditions" on his payment by stating that Binns' acceptance of $73,620 payment signified Binns' acceptance of the payment as the firm's "entire obligation" to Binns.

Binns, however, has not offered evidence that the fees owed to him establish rights subject to conversion. The insurance carrier's payment to Flaster contained no separate set of funds earmarked for Binns, nor is there evidence that Flaster and Binns had any agreement to segregate funds paid for his time. Instead, Flaster received the funds from the insurance carrier and then promptly remitted payment to Binns in the amount it believed it owed him. Binns has not established that he had a specified interest in a particular set of Flaster's funds. Therefore, Binns cannot prevail on Count III and summary judgment is granted.[11]

## **ORDER**

**AND NOW**, on this __22nd__ day of March, 2007, defendants' motion for summary

---

[11]Binns raises a Fed. R. Civ. Proc. 56(f) argument. Under certain circumstances, summary judgment may be precluded if discovery is incomplete, but this exception does not apply in this case. Rule 56(f) provides:

> Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Binns contends that documents possessed by counsel for the insurance carrier would support its opposition to summary judgment, and that until it obtains these documents, summary judgment is precluded. Binns has since obtained the documents through a motion to compel. It is apparent from correspondence between Binns and counsel for the insurance carrier, however, that these documents contain no facts that would assist Binns in opposing summary judgment. Letter from Flaster, November 8, 2006. Binns has also failed to satisfy the procedural requirements of Rule 56(f) by neglecting to submit an affidavit regarding the facts he believed were contained in the carrier's documents.

judgment (Doc. # 31) is **GRANTED** as to Count I (tortious interference with an existing contract), Count II (tortious interference with prospective contract), and Count III (conversion). Binns is granted an accounting. Further, the parties are ordered to meet to negotiate a settlement regarding the $73,620 payment to Binns and deduction of ten percent for overhead. If by April 1, 2007, the parties fail to reach agreement, Binns may request a hearing.

*Anita B. Brody*

_____
ANITA B. BRODY, J.

Copies **VIA ECF** on _____ to:          Copies **MAILED** on _____ to:

O:\ABB 2007\Binns summary judgment order.wpd